IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-599

Filed 16 July 2025

Wake County, Nos. 19CVD009317-910, 19CVD013503-910

MILDRED DENIS, Plaintiff,

v.

JAMINE CHANDLER, Defendant.

Appeal by defendant from an order entered 14 February 2024 by Judge Damion McCullers in Wake County District Court. Heard in the Court of Appeals 28 January 2025.

*Davis Hartman & Wright, LLP, by R. Daniel Gibson, for plaintiff.*

*Smith Legal Solutions, by Katrina L. Smith, for defendant.*

FREEMAN, Judge.

Defendant appeals from a permanent child support and equitable distribution order entered 14 February 2024. On appeal, defendant argues the trial court erred by: (1) ordering defendant to pay retroactive child support; (2) entering a child support order that was not supported by competent evidence; (3) entering an equitable distribution judgment that was not supported by competent evidence; (4) abusing its discretion in failing to consider other distributive factors; and (5) ordering defendant's distributive award to offset his child support obligations. After careful consideration, we affirm in part, vacate in part, reverse in part, and remand.

## I.    Factual and Procedural Background

Plaintiff and defendant married on 14 August 2016, separated on 21 December 2017, and divorced on 6 December 2019.  After their marriage in August 2016, the parties temporarily separated in April 2017 and reconciled prior to selling their first home in July 2017.  The parties share two children in common, and each has a child from a previous relationship.  Defendant has another child born after the parties' separation.

On the morning of 20 December 2017, defendant and plaintiff were closing on the purchase of their new home.  Defendant had paid a $60,341 deposit towards the purchase of the home, but just before the closing of the home, the parties' marital problems led to discussions of permanent separation.

That morning, defendant presented plaintiff with an agreement that stated plaintiff would give defendant $48,000 from the sale of their new home in the event the parties separated or divorced.  Plaintiff testified that while they were getting ready to leave for the closing of their new home, defendant gave her a document and said he would not go to closing unless she signed it at that moment.  Plaintiff stated defendant had not mentioned anything about the document previously and she "had to sign it" or there was "no way" she "could close on the house[.]"  Plaintiff testified that:

> It was tense because the document he provided me was a
> note basically saying that, in the event that he and I were
> to split, that I would owe him 40-something-thousand

dollars. And we argued a little bit. I told him. I said, "This is just proving to me that you had one foot in and one foot out o[f] the marriage. So I'm going to sign because we—I'm not going to go and disappoint the children." And I signed it there, threw it at him in the bathroom, and then we left.

Plaintiff stated she "signed the note at the apartment," outside the presence of a notary, "and then [defendant] took [her] to the UPS Store to get it notarized." Sharon French, the Notary Public whose signature and notarization were on the document, testified she: (1) did not remember notarizing or signing the agreement; (2) recognized the last name Denis; (3) had discarded her notary journal; (4) did not know if the document was a copy or original; and (5) did not sign or notarize documents that had been previously signed before they were brought to her.

The trial court set aside this agreement on the grounds of undue influence or duress and made the following findings of fact and conclusions of law:[1]

> 45. On <u>December 20, 2017</u>, the morning of the closing of the sale of Granite, the Defendant presented a document to Plaintiff to sign which provided that $48,000 would be returned to him out of the proceeds of the sale of Granite if the parties separated and divorced. This document was later identified as promissory note and is hereinafter referred to as "the document."[2]

> 46. Prior to the closing, the Defendant had not mentioned anything about the document or that he was due anything extra due to supplying separate property money for the purchase of Granite.

> 47. The Plaintiff did not secure the advice of an attorney

---

[1] The home closing at issue is referred to by the trial court as "Granite."

[2] All excerpts of the trial court's order are restated verbatim.

prior to signing the document, nor given the time of the closing, had the opportunity or time to do so.

48. All of this was a complete surprise to the Plaintiff and was done by the Defendant to force her to sign the document.

49. The document was signed by the parties at the apartment that they resided in during the transition from homes, and later that day, the signatures were notarized by Notary Public French, who worked at UPS store that the Defendant selected to get the document notarized at.

50. Notary French recognized her signature as the one on the document and that the UPS store, she worked at was very busy.

51. Notary French did not recognize either party, could not independently remember the notary incident or the signatures of the parties, could not produce the journal of notarial acts to confirm the notary event or confirm if the document being submitted by the Defendant in court was the original or copy of, or even the document, that she may have notarized.

52. The document presented in court was not the original.

53. The Defendant told the Plaintiff that he would not appear at the closing or sign any documents for the same unless she signed the document.

54. The Plaintiff signed the document under duress or undue influence.

55. On September 25, 2020, the Plaintiff filed Notice of Concern Regarding Authenticity to put the Court and the Defendant on notice that Plaintiff had concerns about the authenticity of the document.

56. The Plaintiff testified that the document presented in court as the original document was not the version she signed and appeared to be copy.

57. The document presented in court by the Defendant as an original was copy.

58. The document was not lawfully notarized by Notary Public French.

59. Thereafter, the parties signed the documents necessary to close the sale on Granite. The parties signed said documents at different times. The Plaintiff signed the promissory note for the purchase of Granite. The Defendant did not sign the promissory note for the purchase of Granite, but his name was placed on the deed.

That night, the parties separated after a violent argument and, from their separation until 5 March 2022, plaintiff maintained exclusive possession of the new home. On 8 March 2018, plaintiff secured a domestic violence protective order ("DVPO") against defendant. The trial court found as it related to plaintiff's DVPO:

66. The Judge found that the Defendant had taken the "wedding rings" in the DVPO.

67. The Defendant denied that was true and that "many things in that order were not right."

On 10 July 2019, plaintiff filed a complaint for divorce against defendant in Wake County, North Carolina, No. 19 CVD 9317. On 20 August 2019, defendant answered and subsequently counterclaimed for absolute divorce and equitable distribution. Plaintiff responded to these claims on 1 October 2019, but initiated a separate action for equitable distribution, post-separation support, alimony, and temporary and permanent child support on 2 October 2019 in Wake County, North Carolina, No. 19 CVD 13503. On 5 December 2019, plaintiff filed a motion in the cause seeking the same relief in the former case and, on 6 December 2019, a divorce

judgment was entered.

On 2 June 2020 and 17 August 2020, the trial court entered initial and final pre-trial orders. Both parties filed motions to compel discovery, but defendant moved to dismiss plaintiff's duplicate claims; compel discovery in both cases; and later, filed a reply to plaintiff's motion to compel discovery. Plaintiff voluntarily dismissed her claims for temporary child support, post-separation support, and alimony before the matter came on for trial.

In September 2021, both parties filed motions for interim distribution, and on 2 December 2022, the trial court conducted hearings on interim distribution and permanent child custody in case number 18 CVD 8721. Prior to trial held on 8 December 2023 and 11 December 2023, the trial court consolidated duplicate claims into case No. 19 CVD 9317.

At trial, the court received evidence and other testimony regarding the parties' income and other financial information. Such facts are provided in the discussion section below as they become necessary for our analysis.

With regard to equitable distribution, the trial court received evidence regarding a $8,996 payment made by the plaintiff's cousin, Yves Augustin, to plaintiff. Plaintiff testified Augustin gave her "a gift in the amount of $8,996[,]" and provided a gift letter from Augustin stating the $8,996 payment was: "a bona fide gift, and there [wa]s no obligation, expressed or implied, to repay this sum at any time."

However, defendant testified the $8,996 payment was compensation for

assisting Augustin in the sale of his home. Defendant provided invoices from Lumber Liquidators, bank statements, and credit card statements; two checks from Augustin dated 18 August 2017 and 10 October 2017 containing "Repair" and "House Repair" in the memo lines; and noted no additional payments from Augustin took place between the issuance of the checks and alleged signing of the gift letter. Defendant argued this evidence demonstrated he had incurred expenses to assist Augustin and Augustin compensated him for his help preparing Augustin's home for sale.

The trial court entered an equitable distribution and permanent child support order on 14 February 2024. In relevant part, the trial court ordered:

> 2. The Defendant shall reimburse the Plaintiff for FMV of the separate property engagement ring and wedding band that he took from the Plaintiff in the incident resulting in the Defendant having DVPO in the amount of $6500 and that amount shall be deducted from the sale proceeds of Granite before the marital portion of the sale of Granite is distributed.
>
> 3. The Plaintiff shall receive $8996 as her separate property interest from the sale proceeds of Granite before the marital portion is distributed.
>
> 4. The Defendant shall pay Plaintiff as monthly child support the sum of $596 per month on or before the 1st day of each month with the first payment, due and payable on February 1, 2024. The Defendant shall pay this child support obligation until the children graduate from high school or the attainment of the children of the age of 20 years, whichever comes first.
>
> 5. The Defendant shall repay his retroactive child support arrearage obligations to the Plaintiff in the amount of $48,696.65 at the rate of $54 per month to be paid along

with his current child support obligation until the amount of the retroactive child support arrearage he owes the Plaintiff is paid in full.

Defendant timely appealed.

## II.    Jurisdiction

This Court has jurisdiction to review a final judgment of a district court. N.C.G.S. § 7A-27(b)(2) (2023).  As the district court's permanent child support and equitable distribution order constitutes a final judgment, we have jurisdiction to review defendant's appeal.

## III.    Standard of Review

"The standard of review on appeal from a judgment entered after a non-jury trial is whether there is competent evidence to support the trial court's findings of fact and whether the findings support the conclusions of law and ensuing judgment." *Pegg v. Jone*s, 187 N.C. App. 355, 358 (2007) (cleaned up).  "[W]here matters are left to the discretion of the trial court, appellate review is limited to a determination of whether there was a clear abuse of discretion."  *White v. White*, 312 N.C. 770, 777 (1985).  Therefore, "[u]nder this standard of review, the trial court's ruling will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision."  *Biggs v. Greer*, 136 N.C. App. 294, 296–97 (2000) (cleaned up).  "However, the trial court's conclusions of law are reviewed de novo." *Mugno v. Mugno*, 205 N.C. App. 273, 276 (2010) (cleaned up).

## IV.    Discussion

Defendant argues the trial court erred by: (1) ordering defendant to pay retroactive child support; (2) entering a child support order unsupported by competent evidence; (3) entering an equitable distribution judgment unsupported by competent evidence; (4) abusing its discretion in failing to consider other distributive factors; and (5) ordering defendant's distributive award to offset his child support obligations.[3] We address each argument in turn.

## A. Retroactive Child Support

Defendant first argues that the trial court "reversibly erred by ordering defendant to pay retroactive child support." Specifically, defendant contends "[p]laintiff did not assert a claim for retroactive child support" and the trial court's "inclusion of $129.00 as monthly credits in the retroactive support calculation for expenses" was in error. Though we disagree the trial court erred in awarding retroactive child support, we agree the trial court's calculation of the retroactive support was erroneous.

Subsection 50-13.4(c) of our General Statutes, which governs the determination of child support payments, states: "[t]he court shall determine the

---

[3] Defendant's brief also assigns error to factual findings 49, 50, 51, 58, 84, and 87. However, beyond mere conclusory statements and recitations of fact, defendant fails to present any legal argument or citations to authority that such findings were not supported by competent evidence. Accordingly, these issues are abandoned, and such findings are binding on appeal. *See* N.C. R. App. P. 28(b)(6) (2023) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."); *Langston v. Richardson*, 206 N.C. App. 216, 219 (2010) ("[A]ll the other findings to which [defendant] has not assigned error or argued are presumed to be supported by competent evidence and are binding on this Court.").

amount of child support payments by applying the presumptive guidelines established pursuant to subsection (c1) of this section." N.C.G.S. § 50-13.4(c) (2023). Subsection 50-13.4(c1) mandates the Conference of Chief District Court Judges to establish child support guidelines:

> for the computation of child support obligations, *including retroactive support obligations*, of each parent as provided in Chapter 50 or elsewhere in the General Statutes and *shall develop criteria for determining when, in a particular case, application of the guidelines would be unjust or inappropriate.*

N.C.G.S. § 50-13.4(c1) (2023) (emphasis added).

"Child support awarded for that period of time prior to the date on which a party files a complaint or motion for child support 'is properly classified as retroactive child support.'" *Jonna v. Yaramada*, 273 N.C. App. 93, 101 (2020) (quoting *Respess v. Respess*, 232 N.C. App. 611, 628 (2014)). "Child support awarded, however, from the time a party files a complaint for child support to the date of trial is not retroactive child support but is in the nature of prospective child support representing that period from the time a complaint seeking child support is filed to the date of trial." *Taylor v. Taylor*, 118 N.C. App. 356, 361 (1995) (cleaned up), *rev'd on other grounds*, 343 N.C. 50 (1996). Our precedent "require[s] that an award of retroactive child support be supported by evidence of plaintiff's actual expenditures for the children during the period for which she seeks retroactive child support." *Respess*, 232 N.C. App. at 629.

Therefore, as set forth in our child support guidelines, retroactive support may be determined through calculating "(a) . . . the amount of support that would have been required had the guidelines applied at the beginning of the time period for which support is being sought, or (b) based on the parent's fair share of actual expenditures for the child's care." AOC-A-162, Rev. 1/23, Page 2 of 25 (2023). The guidelines further state:

> When a child for whom support is being determined is covered by a family policy, only the health insurance premium *actually attributable* to that child is added. If this amount is not available or cannot be verified, the total cost of the premium is divided by the total number of persons covered by the policy and then multiplied by the number of covered children for whom support is being determined.

AOC-A-162, Rev. 1/23, Page 4 of 25 (2023) (emphasis added). The guidelines' worksheet A also provides the formula to calculate a child's portion, again, stating: "Health Insurance premium costs − child's/children's portion only (total premium ÷ [the number] of persons covered × [the number] of children subject to order = children's portion.)" AOC-CV-627, Rev. 1/23, Worksheet A § 5(b) (2023) (cleaned up). "Failure to follow the guidelines constitutes reversible error." *Rose v. Rose*, 108 N.C. App. 90, 93 (1992).

Here, defendant's argument asserting plaintiff did not request or plead for retroactive support is unsupported by the record. Plaintiff's complaints in both actions requested child support pursuant to N.C.G.S. § 50-13.4(c) and plaintiff's counsel explicitly stated at trial, "we're going to be presenting information for those

periods of time, from 2018 to today," and "[w]e'd like a reasonable amount of child support . . . retroactive back to that date." Indeed, subsection 50-13.4(c) requires trial courts to "determine the amount of child support payments by applying the presumptive guidelines established in subsection (c1)," to which subsection (c1) explicitly sets forth the guidelines shall be established, "for the computation of child support obligations*, including retroactive support obligations*[.]" N.C.G.S. § 50-13.4(c), (c1) (2023) (emphasis added). Because plaintiff did seek reimbursement for previous expenditures, the trial court could properly award them. *See Respess*, 232 N.C. App. at 629.

However, defendant correctly asserts the trial court did not reimburse plaintiff for actual expenditures. Here, the trial court miscalculated its award and directly contradicted the guidelines because it did not calculate the children's specific portion of health insurance costs. Though the record before us is voluminous, plaintiff's pay stubs demonstrate the cost of insurance for herself *and* all of her children as $129 per paycheck for 2023.[4] Further, all six child support worksheets in the record reflect a monthly credit to plaintiff in the same amount. Therefore, the trial court blanketly awarded plaintiff monthly credit for her *total* $129 per paycheck in health insurance premiums, but did not determine, nor calculate, the amount "actually attributable" to the children in this action as called for by the guidelines. AOC-A-162, Rev. 1/23,

---

[4] Plaintiff's exhibit titled, "2023 Per Paycheck Contributions" lists "PPO (Cigna/UHC)" as $129 under a column listed "Employee + Child(ren)[.]"

Page 4 of 25 (2023).[5] Accordingly, we vacate that portion of the trial court's order and remand for correct calculation of the children's portion of health insurance premium costs for both retroactive and prospective child support in compliance with the guidelines.

**B. Income**

Next, defendant argues the trial court "reversibly erred by entering a prospective child support order that was not supported by competent evidence presented at the hearing."[6] In this case the trial court specifically found:[7]

> 94. During the party's relationship and their marriage, the Plaintiff has done business administrative work and has generally always been employed.
>
> 95. The Plaintiff is presently employed by CISCO as Project Manager and has been employed by CISCO since 2012.
>
> 96. In 2019, the Plaintiff secured second job working with Office Angels. She did contract business administrative work and received 1099 for the money she earned from that company. The Plaintiff secured this second job because the Defendant was paying little to no child support and she alone was supporting the children including paying for their private school tuition at Word of God Academy.

---

[5] Plaintiff testified this amount included both the two children subject to this action, and her son from a previous relationship. Further, plaintiff's employer wage affidavit also highlights this error where it states the total children's portion (including plaintiff's child from another relationship) being $39.14 per pay period, and lists a separate amount for plaintiff's portion of the health insurance premium.

[6] Defendant also contends the trial court failed to use plaintiff's current monthly gross income ($2,940) to calculate prospective child support arrears; however, this is the figure the trial court used. *See Taylor*, 118 N.C. App. at 361 (cleaned up) ("Prospective child support represent[s] that period from the time a complaint seeking child support is filed to the date of trial."). Accordingly, defendant's argument lacks merit.

[7] The challenged order contains some grammatical and substantive errors.

97. The amount of gross income that the Plaintiff earned and could earn for the purpose of calculating child support was and is as follows:

a. 2018, $74,412 all from her CISCO job.

b. 2019, $75,593.25, of which $75,012 was from her CISCO job and $581.25 was from her second

c. 2020, $79,759, of which $74,184 was from her CISCO job and $5,575 was from her second job.

d. 2021, $84,818.17, of which $75,111 was from her CISCO job and $9,707.17 was from her second

e. 2022, $100,321.89, of which $77,905 was from her CISCO job and $22,416.89 was from her second job.

f. 2023, $100,321.89 of which $77,905 was from her CISCO job and $22,416.89 was from her second job.

78. The Plaintiff testified that it is very hard to keep up with her obligations as parent and work all the hours of the second job that she has had to do in recent years because the Defendant did not pay child support and that the amount of work that was reasonable and relative for the income that she need to earn to support the children would be consistent with the work and income that she did and received in 2021 where she earned $10,000 from her second job.[8]

79. The Plaintiff always paid for the health, dental and eye insurance for the children through her work with CISCO and she paid the following amounts as follows:

a. 2018, $129 per month.

b. 2019, $129 per month.

---

[8] No findings of fact or conclusions of law were omitted from this quote of the trial court's order, rather, the order states finding of fact 97, and then immediately after states finding of fact 78.

c. 2020, $129 per month.

d. 2021, $129 per month.

e. 2022, $129 per month.

f. 2023, $129 per month.

80. The Defendant's earning income ability has been less stable than the Plaintiff's.

81. The Defendant testified that he made $80,000 to $90,000 per year in 2012 and 2013 from his music promotion business.

82. On <u>May 29, 2018</u>, the Defendant expressed in a loan application to purchase a work van for his business, that he earned salary of $10,000 per month.

83. The Defendant testified and attempted to explain that the $10,000 figure was for his gross income from his business and that he only netted $4000 from the business. No proof of the expenses that the Defendant reference was submitted into evidence.

84. <u>On February 12, 2020</u>, the Defendant expressed in Financial Affidavit that his last year, 2019, adjusted gross income was $52,265.74.

85. In that same financial affidavit, the Defendant expressed that his current gross income for 2020 was $2940 per month.

86. The Defendant testified during their relationship, the Plaintiff was responsible for submitting their income to the tax return provider and that she made an error resulting in the Defendant having to pay penalty for the same. There was no such proof of the error or penalty that Defendant allegedly had to pay submitted into evidence.

87. The Defendant testified that after his separation from the Plaintiff, that his new tax provider made an error regarding the submission of his gross income which

resulted in him providing wrong information in the financial affidavit that he signed. There was no evidence of this error or of an amended tax return submitted into evidence to substantiate this.

88. The Defendant present operates Chandler's Flooring, Inc primarily overseeing its 4 contract employees.

89. The Defendant was injured in 2020 which affects his ability to do some physical labor. However, there was no evidence submitted that Defendant cannot still operate his business overseeing his employees and earning income from his business.

90. The financial affidavit that the Defendant signed indicating his gross income was $2940 per month was signed in the same year that he was injured.

91. The amount of income that the Defendant earned and could earn for the purpose of calculating child support was and is as follows:

a. 2018, $10,000 per month.

b. 2019, $4355.47 per month.

c. 2020, $2940 per month.

d. 2021, $2940 per month.

e. 2022, $2940 per month.

f. 2023, $2940 per month.

92. The Defendant has engaged in questionable title transfer practices to further his financial interests.

93. The Defendant has testified to facts contrary to the findings of the DVPO, and contrary to information in loan application and sworn financial statement.

94. The Defendant blamed the Plaintiff and his tax preparer for mistakes causing him financially without

providing any supporting evidence of the same.

95. The Defendant refused to cooperate with the Plaintiff to refinance Granite to ensure that his separate debt judgment would be satisfied which also deprived his own children of a home.

96. The Defendant did not consistently or significantly pay the Plaintiff child support while paying $1500 per month for a BMW and while he had another car, a Nissan 350Z car available to him.

97. The Defendant has been previously both physically and emotionally to the Plaintiff.

98. The Defendant's characterization of, and remarks about and attitude towards the Plaintiff, the mother of his two children, is not respectful and indicative of his desire to harm the Plaintiff.

99. The Defendant has held and still holds personal animus against the Defendant and his testimony was often not credible.

*a. Monthly Gross Income*

Defendant argues the trial court "did not explain how [d]efendant's gross income was calculated[,]" as related to his business expenses and that such finding was not supported by evidence at trial. Our review of child support orders is usually limited to determining whether the trial court abused its discretion. *White*, 312 N.C. at 777. However, "[i]n child support cases, determinations of gross income are conclusions of law reviewed de novo, rather than findings of fact," therefore, "the trial court should make findings specific enough to indicate to the appellate court that due regard was taken of the requisite factors [under the guidelines]." *Thomas v. Burgett*,

265 N.C. App. 364, 367, 368 (2019) (cleaned up).

When the trial court does not make such findings, "this Court has no means of determining whether the order is adequately supported by competent evidence." *Id.* (cleaned up). Further, "[i]t is not for this Court to determine de novo the weight and credibility to be given to evidence disclosed by the record on appeal." *Craven County v. Hageb*, 277 N.C. App. 586, 589 (2021) (cleaned up). Therefore, the trial court's factual findings are binding on this Court when supported by competent evidence, "despite the existence of evidence that might support a contrary finding." *Sergeef v. Sergeef*, 250 N.C. App. 404, 407 (2016) (cleaned up).

Under the guidelines, "[g]ross income from self-employment . . . is defined as gross receipts minus ordinary and necessary expenses required for self-employment or business operation." AOC-A-162, Rev. 1/23, Page 3 of 25 (2023). "Although the [g]uidelines do not define ordinary and necessary expenses, this Court has explained that such expenses include repairs, property management and leasing fees, real estate taxes, insurance, and mortgage interest." *Thomas*, 265 N.C. App. at 367 (cleaned up).

In this case, the trial court relied on competent evidence to support its findings of fact related to defendant's gross income, "despite the existence of evidence that might support a contrary finding." *Sergeef*, 250 N.C. App. at 407. The trial court made "findings specific enough to indicate" to this Court that it took "due regard," *Burgett*, 265 N.C. App. at 368, of the "gross receipts minus ordinary and necessary

expenses," AOC-A-162, Rev. 1/23, Page 3 of 25 (2023), where it found:

83. The Defendant testified and attempted to explain that the $10,000 figure was for his gross income from his business and that he only netted $4000 from the business. No proof of the expenses that the Defendant reference was submitted into evidence.

84. On February 12, 2020, the Defendant expressed in Financial Affidavit that his last year, 2019, adjusted gross income was $52,265.74.

85. In that same financial affidavit, the Defendant expressed that his current gross income for 2020 was $2940 per month.

86. The Defendant testified during their relationship, the Plaintiff was responsible for submitting their income to the tax return provider and that she made an error resulting in the Defendant having to pay penalty for the same. There was no such proof of the error or penalty that Defendant allegedly had to pay submitted into evidence.

87. The Defendant testified that after his separation from the Plaintiff, that his new tax provider made an error regarding the submission of his gross income which resulted in him providing wrong information in the financial affidavit that he signed. There was no evidence of this error or of an amended tax return submitted into evidence to substantiate this.

. . .

92. The Defendant has engaged in questionable title transfer practices to further his financial interests.

93. The Defendant has testified to facts contrary to the findings of the DVPO, and contrary to information in loan application and sworn financial statement.

94. The Defendant blamed the Plaintiff and his tax preparer for mistakes causing him financially without

providing any supporting evidence of the same.

. . .

99. The Defendant has held and still holds personal animus against the Defendant and his testimony was often not credible.

Defendant admits "tax returns and testimonial evidence were presented to show [d]efendant's gross income from 2019–2022 tax years," however, he contends no findings were made as to the trial court's calculations regarding defendant's business expenses and that "the evidence at trial did not support the [trial] court's determination."

In this case, the trial court's findings of fact demonstrate it made credibility determinations regarding defendant's testimony, financial affidavit, and tax returns. Specifically, the trial court's factual findings note the discrepancies in defendant's testimony and other evidence, or lack thereof. Defendant's tax returns do not demonstrate expenses for "repairs, property management, leasing fees, real estate taxes, insurance, and mortgage interests" where defendant took standard deductions for each relevant tax year, and therefore, these tax returns do not list ordinary and necessary expenses. Similarly, the trial court stated in finding 83 that "[n]o proof of the expenses that [d]efendant reference[s] [were] submitted into evidence." Consequently, defendant's argument asks this Court to draw different conclusions on evidentiary issues the trial court has resolved based upon the evidence presented.

This Court does not judge witness credibility to determine whether we agree

or disagree with a trial court's factual findings. We simply review whether the trial court's factual findings are supported by competent evidence and whether those findings support its conclusions. Though defendant urges this Court to rely on his preferred evidence, here, the trial court relied upon defendant's financial affidavit to make unchallenged factual findings 83–87 and 92–94 regarding his credibility, and these findings support its gross income calculations. Accordingly, we affirm the trial court's conclusion of defendant's gross monthly income.

b. *Imputation of Defendant's Income and Calculation of Plaintiff's 2023 Income*

Next, defendant argues the trial court erred in imputing income to defendant because there was "no evidence that [d]efendant suppressed his income with the intent required for income imputation." Additionally, defendant argues the trial court abused its discretion by relying on plaintiff's past income to resolve conflicts in her 2023 income.

This Court explained in *Kaiser v. Kaiser*:

> It is well established that child support obligations are ordinarily determined by a party's actual income at the time the order is made or modified. Although this means the trial court must focus on the parties' current income, past income often is relevant in determining current income. Indeed, this Court has expressly held that a trial court may permissibly utilize a parent's income from prior years to calculate the parent's gross monthly income for child support purposes. . . . What matters in these circumstances is the reason *why* the trial court examines past income; the court's findings must show that the court used this evidence to accurately assess current monthly

gross income.

259 N.C. App. 499, 505–06 (2018) (emphasis added) (cleaned up).

"[W]here the court finds that a party's most recent pay stubs or most recently filed tax return are unreliable, the court can use past years' income to fill in the gaps." *Id.* at 505; *e.g. Diehl v. Diehl*, 177 N.C. App. 642, 650 (2006). Further, this Court has vacated and remanded cases where the trial court made no specific findings to justify using past income. *E.g. Eidson v. Kakouras*, 286 N.C. App. 388, 404 (2022). Therefore, "the trial court should make findings specific enough to indicate to the appellate court that due regard was taken of the requisite factors [under the guidelines.]" *Thomas*, 265 N.C. App. at 368.

The trial court here did not err in relying on defendant's past income, nor did it impute income, because its findings articulated that defendant's most recent financial evidence was unreliable. *See Diehl*, 177 N.C. App. at 650. The trial court highlighted the unreliability of defendant's evidence by finding defendant: (1) testified to figures without proof of expenses in factual finding 83; (2) contradicted information contained in other evidence he submitted in factual finding 93; and, (3) blamed plaintiff for mistakes in financial statements without further supporting evidence in factual finding 94. Similarly, the trial court found defendant's "testimony was often not credible." Therefore, the trial court made findings providing a permissible rationale for using defendant's past income and did so with due regard to the guidelines.

Defendant's argument that the trial court erred in relying on plaintiff's past income to resolve conflicts in her 2023 income is also without merit because "[t]his Court has expressly held that a trial court may permissibly utilize a parent's income from prior years to calculate the parent's gross monthly income for child support purposes." *Kaiser*, 259 N.C. App. at 505 (cleaned up). Here, the trial court grappled with plaintiff's 2023 income by relying on her past income rather than accepting plaintiff's testimony or defendant's proffered explanation from plaintiff's August 2022 to August 2023 bank account deposits. Further, the trial court's factual findings are binding on this Court when supported by competent evidence, "despite the existence of evidence that might support a contrary finding." *Sergeef*, 250 N.C. App. at 407. Plaintiff's varying, monthly income was a sufficient reason why the trial court could "use past years' income to fill in the gaps[,]" *Kaiser*, 259 N.C. App. at 505, and therefore, such past years' income was competent evidence to support the trial court's finding of fact 97 and 78.

### c. Credit for Biological Child

Defendant also argues the trial court erred in calculating his child support obligation by failing to provide credit for support of a biological child that he shares with another woman. We disagree.

Under the guidelines, "[c]urrent child support payments actually made by a parent under any existing court order, separation agreement, or voluntary support arrangement are deducted from the parent's gross income" and "[t]he court *may*

consider a voluntary support arrangement as an existing child support obligation when the supporting parent has consistently paid child support for a reasonable and extended period of time." AOC-A-162, Rev. 1/23, Page 4 of 25 (2023) (emphasis added). "The use of the word 'may' generally connotes permissive or discretionary action and does not mandate or compel a particular act." *Brock & Scott Holdings, Inc. v. Stone*, 203 N.C. App. 135, 137 (2010) (cleaned up). Therefore, under the Guidelines, the trial court *may* exercise its discretion by providing a party with a credit for a voluntary support arrangement after a showing that the party "consistently paid child support for a reasonable and extended period of time." AOC-A-162, Rev. 1/23, Page 4 of 25 (2023). Further, "where matters are left to the discretion of the trial court," this Court's review "is limited to a determination of whether there was a clear abuse of discretion[,]" *White*, 312 N.C. at 777. "Under this standard of review, the trial court's ruling will be upset only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision." *Biggs*, 136 N.C. App. at 296–97 (cleaned up).

Though unpublished, this Court's opinion in *Adams v. Lewis* noted where the party did not provide a court order or any "evidence of when he began paying or how regularly he paid support for his other child[,]" the party failed to present evidence that he had paid child support for his other child "consistently" or "for a reasonable

and extended period of time."[9]   No. COA15-205, 2016 WL 1320035, at \*7 (N.C. Ct. App. Apr. 5, 2016) (citations omitted).  There, we held "the trial court did not abuse its discretion in failing to give plaintiff credit for his claimed voluntary payments of support to his other child." *Id.*

Here, the trial court could have chosen to exercise its discretion by providing defendant with a credit for a voluntary support arrangement only *after* a showing that defendant "consistently paid child support for a reasonable and extended period of time." AOC-A-162, Rev. 1/23, Page 4 of 25 (2023).  Defendant failed to show he had consistently, and for an extended period of time, paid voluntary child support where his testimony demonstrated his payments "would vary . . .  [paying] . . . $50 here, $100  there."   Though  defendant  correctly  asserts  that  this  testimony  was unchallenged, it failed to provide sufficient evidence of the consistency required for the trial court to exercise its discretion.  In other words, the trial court's discretionary decision to not provide defendant with a credit for another biological child could not have been "so arbitrary that it could not have been the result of a reasoned decision[,]" *Biggs*, 136 N.C. App. at 296–97, because defendant failed to make the requisite showings for such credit under the guidelines.  Therefore, the trial court did not abuse its discretion by failing to provide credit for defendant's other biological child.

---

[9] "Although unpublished opinions do not have precedential value, an unpublished opinion may be used as persuasive authority at the appellate level if the case is properly submitted and discussed and there is no published case on point." *In re N.B.*, 289 N.C. App. 525, 534 n.4 (2023) (cleaned up).

### d. *Use of N.C. Worksheet B*

Defendant next contends the trial court "reversibly erred by failing to use N.C. Worksheet B to calculate defendant's child support obligations from 2018–2021."

> The Guidelines provide that Worksheet A is to be used "when one parent . . . has primary physical custody of all of the children for whom support is being determined. A parent (or third party) has primary physical custody of a child if the child lives with that parent (or custodian) for 243 nights or more during the year"; the use of Worksheet B is appropriate when both "[p]arents share custody of a child if the child lives with each parent for at least 123 nights during the year and each parent assumes financial responsibility for the child's expenses during the time the child lives with that parent." Guidelines, Ann. R. 5.

*Jonna v. Yaramada*, 273 N.C. App. 93, 122 (2020).

In other words "[a] parent does not have shared custody of a child when that parent has visitation rights [which] allow the child to spend less than 123 nights per year with the parent[,] and the other parent has primary physical custody of the child." AOC-CV-628, Side Two, Rev. 1/15 (2023). In *Jonna*, this Court vacated a child support order and remanded for the trial court to make additional factual findings as to the number of nights spent with the parent and to determine "whether the custodial arrangement [was] a situation involv[ing] a true sharing of expenses." 273 N.C. App. at 123 (cleaned up).

Here, the trial court made the following factual findings:

> 73. In the DVPO, the Plaintiff was awarded temporary custody of the parties' children and the Defendant having supervised visitation with them.

74. On July 12, 2018, the Defendant filed for custody of the children in case number 18CVD8721. On September 12, 2018, the parties agreed to a Consent Order for Temporary Child Custody and/or Visitation which provided that the Plaintiff have primary physical custody of the children.

75. On December 2, 2022, after a trial on the merits, the court entered an Order on Permanent Custody which provided that Plaintiff have primary physical custody of the children.

Subsequently, the trial court stated in its conclusions of law, "[g]iven the court order[ed] visitation of the Defendant and the amount of time he visits the children, child support should be calculated based upon Schedule A."

In reliance on an underlying order not before this Court, the trial court did not make specific factual findings or conclusions of law that determined the number of nights per year the children spent with each parent between 2018 and 2021.[10] Plaintiff testified that in "the last couple of months," defendant visited the children "maybe a couple of times[,]" and "prior to that, a year[,] [a]nd then here and there." Defendant testified during this time that he had visited with the children on alternating weekends during the school year; the children stayed with him Monday through Friday over summer break and alternating weekends; and the parties alternated custody over other school breaks.

However, because the trial court failed to make any findings as to the number of nights spent with each parent between 2018 and 2021, this Court cannot review

---

[10] Such order is not challenged on appeal, nor contained within our record.

whether the trial court used the correct worksheet to determine child support in that timeframe. Accordingly, we vacate and remand the child support order for the trial court to make additional factual findings as to the number of nights the children spent with each parent.

## C. Equitable Distribution

Defendant next argues the trial court erred because the equitable distribution judgment was not supported by competent evidence. Specifically, defendant challenges factual findings 43, 44, 46–48, 68, 72, 90, 90(a), and 93(a) as unsupported by competent evidence. Defendant further challenges the related conclusions of law 4, 5(a)–(d), and decretal provisions 2, 3, and 12. We address each argument in turn.

When entering an equitable distribution judgment, section 50–20 "requires the trial court to conduct a three-step process: (1) classify property as being marital, divisible, or separate property; (2) calculate the net value of the marital and divisible property; and (3) distribute equitably the marital and divisible property." *Brackney v. Brackney*, 199 N.C. App. 375, 381 (2009); *see also* N.C.G.S. § 50–20 (2023). "Furthermore, in doing all these things the court must be specific and detailed enough to enable a reviewing court to determine what was done and its correctness." *Hill v. Hill*, 244 N.C. App. 219, 223–24 (2015) (cleaned up). "Because the classification of property in an equitable distribution proceeding requires the application of legal principles, this determination is most appropriately considered a conclusion of law[,]" and reviewed de novo. *Roberts v. Kyle*, 291 N.C. App. 69, 75 (2023) (cleaned up).

Therefore, "[t]he standard of review for a trial court's classification of property during equitable distribution is whether competent evidence supports the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." *Roberts*, 291 N.C. App. at 74 (cleaned up).

### 1. *Classification of $8,996*

Here, defendant argues the trial court erred in findings of fact 43, 44, and 93(a), conclusion of law 4, and decretal provision 3 because the classification of the $8,996 check from Augustin as separate property and a gift to plaintiff was in error. We disagree.

Marital property is defined as "all real and personal property acquired by either spouse or both spouses during the course of the marriage and before the date of the separation of the parties, and presently owned." N.C.G.S. § 50–20(b)(1) (2023). Separate property includes "all real and personal property acquired by a spouse before marriage or acquired by a spouse by bequest, devise, descent, or gift during the course of the marriage." N.C.G.S. § 50–20(b)(2) (2023). A party who claims marital property by gift is separate property bears the burden of demonstrating the alleged donor intentionally transferred "ownership of the property without receiving any consideration in return." *Burnett v. Burnett*, 122 N.C. App. 712, 714 (1996) (cleaned up).

Here, defendant contends the trial court erred by overlooking the evidence defendant presented at trial. However, "[t]his Court will not reweigh evidence."

*Jonna*, 273 N.C. App. at 121 (cleaned up). The trial court found that:

> 43. The Plaintiff's cousin, Yves Augustin, had gifted $8996 to the Plaintiff for the purpose of purchasing Granite.
>
> 44. There was no gift-letter from the Defendant's family which evidences the use of a loan he allegedly secured from them to purchase Granite.

Subsequently the trial court stated in its conclusions of law that: "[t]hat the $8996 gifted by the Plaintiff's cousin to help the Plaintiff buy Granite is the separate property of the Plaintiff."

Though this Court reviews the trial court's classification of the check *de novo*, we are nonetheless bound by the trial court's findings if they are supported by competent evidence. At trial, plaintiff presented competent evidence when she testified that she had received the $8,996 check from Augustin as a gift and admitted a gift letter which stated "there is no obligation, express[ ] . . . or implied, to repay this sum at any time." Therefore, factual finding 43 is supported by both plaintiff's testimony and by a gift letter from Augustin.

We agree with defendant that the trial court erroneously found in factual finding 44 that "[t]here was no gift-letter from the Defendant's family which evidences the use of a loan he allegedly secured from them to purchase Granite."[11]

---

[11] This finding is peculiar because it implies that the absence of a gift letter must mean the check from Augustin was a gift. This logic is flawed. The absence of something does not necessarily mean the existence of something else—for example, if the check were a loan, there would not be a gift letter. Therefore, the trial court must be cautious and detailed in explaining its rationale when making its factual findings and abide by the competent evidence standard. *See Pegg*, 187 N.C. App. at 358.

However, this finding had no substantive impact on the trial court's reasoning or conclusions. Further, the trial court found in factual finding 43 that plaintiff had received the check from Augustin as a gift.

Defendant's presentation of conflicting evidence does not change our precedent that conclusions of law are generally "upheld when they are supported by findings of fact." *In re C.E.L.*, 171 N.C. App. 468, 479 (2005). In this case, the trial court did not err in finding the $8,996 from Augustin to be a gift, where such finding was supported by competent evidence. Thus, the trial court did not err in concluding the $8,996 gift from Augustin to be Plaintiff's separate property.[12]

## 2. Set Aside Agreement

Defendant next argues the trial court erred in factual findings 46–48 and conclusion of law 5(a)–(d) because there was no evidence to set aside the parties' $48,000 agreement due to duress or undue influence.[13]

> It is well settled in this jurisdiction that when the trial
> court sits without a jury, the standard of review on appeal

---

[12] Defendant alternatively argues the $8,996 gift was converted to marital property when used towards the purchase of the parties' new home, however, defendant never raised this theory or argument at the trial level. Accordingly, because defendant failed to raise this issue at the trial level, he has failed to preserve it for appellate review. N.C. R. App. P. 10(a)(1) (2023); *see also Wood v. Weldon*, 160 N.C. App. 697, 699 (2003) ("[T]he law does not permit parties to swap horses between courts in order to get a better mount, meaning, of course, that a contention not raised and argued in the trial court may not be raised and argued for the first time in the appellate court." (cleaned up)); *Cushman v. Cushman*, 244 N.C. App. 555, 562 (2016) ("Our Supreme Court has long held that where a theory argued on appeal was not raised before the trial court, the law does not permit parties to swap horses between courts in order to get a better mount in the appellate courts." (cleaned up)).

[13] Defendant alternatively argues the agreement was ratified by plaintiff, however, again, defendant never raised this theory or argument at the trial level. Accordingly, because defendant failed to raise this issue at the trial level, he has failed to preserve it for appellate review. N.C. R. App. P. 10(a)(1).

is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts. While findings of fact by the trial court in a non-jury case are conclusive on appeal if there is evidence to support those findings, conclusions of law are reviewable de novo.

*Lee v. Lee*, 167 N.C. App. 250, 253 (2004) (cleaned up).

"What is designated by the trial court as a finding of fact . . . will be treated on review as a conclusion of law if essentially of that character." *Wachacha v. Wachacha*, 38 N.C. App. 504, 507 (1978). Therefore, "[t]he label of fact put upon a conclusion of law will not defeat appellate review." *Id*. (citation omitted). "[D]eterminations reached by application of legal principles[,]" like duress and undue influence, "are conclusion[s] of law." *Onnipauper LLC v. Dunston*, 290 N.C. App. 486, 489 (2023) (cleaned up). Accordingly, the trial court's purported factual finding that "Plaintiff signed the document under duress or undue influence[,]" is a conclusion of law which this Court reviews de novo. *See Lee*, 167 N.C. App. at 253.

"Undue influence is the fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result." *Howell v. Landry*, 96 N.C. App. 516, 526 (1989) (cleaned up). Similarly, "[d]uress exists" when someone, "by the unlawful or wrongful act of another, is induced to make a contract or perform or forego some act under circumstances which deprive him of the exercise of free will[,]" and "[a]n act is wrongful if made with the corrupt intent to coerce a transaction grossly unfair to the

victim and not related to the subject of such proceedings." *Id.* (cleaned up).

"Duress is the result of coercion. . . . Undue influence may exist where there is no misrepresentation or concealment of a fact and the pressure applied to procure the victim's ostensible consent to the transaction falls short of duress." *Link v. Link*, 278 N.C. 181, 191 (1971). Therefore, when "the court cannot find sufficient threat to constitute duress, it may still find the presence of undue influence." *Coppley v. Coppley*, 128 N.C. App. 658, 664 (1998).

> Relevant factors in determining if the victim was subject to undue influence and whether that person's will was actually overcome include the age, physical and mental condition of the victim, whether the victim had independent advice, whether the transaction was fair, whether there was independent consideration for the transaction, the relationship with the victim and alleged perpetrator, the value of the item transferred compared with the total wealth of the victim, whether the perpetrator actively sought the transfer and whether the victim was in distress or an emergency situation.

*Howell,* 96 N.C. App. at 527 (cleaned up).

Because "[t]he relationship between husband and wife is the most confidential of all relationships, and transactions between them, to be valid, must be fair and reasonable[,]" our Courts have refused to enforce separation agreements attained by duress. *Eubanks v. Eubanks*, 273 N.C. 189, 195–96 (1968). *See, e.g.*, *Stegall v. Stegall*, 100 N.C. App. 398, 401 (1990); *see generally Link v. Link*, 278 N.C. 181 (1971); *Edwards v. Bowden*, 107 N.C. 58 (1890).

In *Coppley*, for example, this Court set aside a party's consent order for duress.

128 N.C. App. at 667. In that case, the plaintiff had changed locks and security codes to the marital residence; "closed all of the couples' joint" bank accounts; and threatened to "disgrace" the defendant in court and "subject the minor children to custody proceedings in court" to obtain the defendant's consent. *Id.* at 665 (cleaned up). The "[p]laintiff told [the] defendant that if she did not complete, sign, and notarize a document purporting to govern their separation, he would take her to court and expose the minor children to the facts surrounding their separation." *Id.* At the time of the entry of the consent order, defendant was "under the influence of prescription medication" to help her with "uncontrollable bouts of crying and insomnia" and asserted she was "shocked and confused." *Id.* at 665–66 (cleaned up).

This Court stated:

> It is clear that defendant was in a vulnerable position—at the mercy of plaintiff, who determined defendant's rights in regards to her children; that plaintiff engaged in subtle manipulation of defendant in that vulnerable position— threatening defendant's relationship with her children if she did not sign the consent order and go along with his terms for the custody and support of the minor children, and the distribution of the marital property; and that defendant was thereby robbed of taking action of her own free will, preventing the giving of true consent.

*Id.* at 667.

Here, defendant argues the agreement was not attained by duress or undue influence because plaintiff testified that "she signed the agreement to avoid disappointing the children with a delayed home closing." Further, defendant argues

the trial court failed to weigh evidence of other factors. We agree.

Presuming, without deciding, that factual findings 46–48 are supported by competent evidence, the record before us does not support the conclusion that the agreement was signed by duress, nor undue influence. *See Lee*, 167 N.C. App. at 253. At the time of the signing, plaintiff demonstrated no physical or mental impairments, nor was she faced with an emergency. Though plaintiff testified defendant had surprised her with the agreement, surprise or shock alone does not rise to undue influence, let alone duress. *See Link*, 278 N.C. at 191. Further, plaintiff's testimony reveals no coercion when she stated she ultimately signed the agreement to avoid "disappoint[ing] the children."

Here, plaintiff's testimony certainly demonstrates she felt external pressure and signed the agreement to avoid conflict with defendant, disapproval of her children, and delay in the closing of the parties' home. However, the pressure applied in the present case does not rise to the level of overriding plaintiff's ability to freely consent. Rather, plaintiff's testimony reveals she understood the nature of the agreement and that she freely chose to sign the agreement after considering her familial obligations. Accordingly, we vacate and reverse that part of the alimony order.

### 3. *Testimony and Valuation of Rings*

Next, defendant challenges the trial court's valuation of plaintiff's separate property in factual findings 68 and 72, and decretal provision 2. Specifically,

defendant challenges the trial court's valuation of plaintiff's wedding rings, arguing such assessment was not supported by "a credible value assessment" and "based solely on [plaintiff's] unsubstantiated testimony."

"In appellate review of a bench equitable distribution trial, the findings of fact regarding value are conclusive if there is evidence to support them, even if there is also evidence supporting a finding otherwise." *Crutchfield v. Crutchfield*, 132 N.C. App. 193, 197 (1999). "This Court is not here to second-guess values of marital and separate property where there is evidence to support the trial court's figures." *Mishler v. Mishler*, 90 N.C. App. 72, 74 (1988).

In reviewing the evidence, this Court defers to the trial court's determination of witnesses' credibility and the weight to be given their testimony, *Leak v. Leak*, 129 N.C. App. 142, 150 (1998), because "[t]he fact finder has a right to believe all that a witness testified to, or to believe nothing that a witness testified to, or to believe part of the testimony and to disbelieve part of it," *Sneed v. Johnston*, 293 N.C. App. 650, 656 (2024) (citations omitted).

> It is well established that lay opinions as to the value of the property are admissible if the witness can show [they possess] knowledge of the property and some basis for [their] opinion. Further, the owners of property have generally been held to have both knowledge and basis for the testimony as to the value of their property.

*Finney v. Finney*, 225 N.C. App. 13, 16 (2013). "Ultimately, the court's equitable distribution award is reviewed for an abuse of discretion and will be reversed only

upon a showing that it is so arbitrary that it could not have been the result of a reasoned decision." *Brackney*, 199 N.C. App. at 381 (cleaned up).

Here, the trial court found in its factual findings:

> 68. The Plaintiff testified that the FMV of those rings is now $6500. The Defendant testified that rings were fakes and that they were only worth $1500, specifically expressing the Plaintiff was liar.
>
> 69. The Defendant characterized that the Plaintiff was untrustworthy or liar on more than one occasion during his testimony.
>
> 70. *There was no credible evidence that the Plaintiff is liar or provided false or incorrect evidence during her testimony.*
>
> 71. Other than the Defendant's testimony, there was no evidence presented which indicated that any of the jewelry that the Defendant ever purchased for himself, or the Plaintiff was fake.

(emphasis added). Subsequently, the trial court determined in finding 72, "[t]he wedding rings, which constitute an engagement ring and wedding band have FMV of $6500."

Defendant's argument that the trial court relied upon plaintiff's testimony and affidavit in error is misplaced. Defendant does not challenge the trial court's credibility determinations made in factual findings 69–71, and therefore, such findings are binding on appeal. *See Leak*, 129 N.C. at 150 (This Court defers to the trial court's determination of witnesses' credibility and the weight to be given their testimony.). We afford great deference to the trial court's credibility determinations,

and the trial court determined plaintiff's testimony credible as to the value of the parties' wedding rings.

As noted, this Court does not "second-guess values of marital and separate property where there is evidence to support the trial court's figures." *Mishler*, 90 N.C. App. at 74. Here, plaintiff's testimony and affidavit support the trial court's $6,500 figure where the trial court determined plaintiff's testimony as credible and she testified to the value of her own property, the wedding rings. *See Finney*, 225 N.C. App. at 16. ("[O]wners of property have generally been held to have both knowledge and basis for the testimony as to the value of their property."). The trial court's value determination was not "so arbitrary that it could not have been the result of a reasoned decision[,]" *Brackney*, 199 N.C. App. at 381, and our review demonstrates the trial court's factual findings are supported by competent evidence. Accordingly, we affirm the trial court's valuation of the party's engagement ring and wedding bands.

### 4. *Credit for Post-Separation Use*

Defendant argues the trial court abused its discretion by not awarding defendant a credit for the parties' post-separation use of the martial home, or alternatively, implementing this use as a distributional factor under subsection 50-20(c)(12) of our General Statutes. N.C.G.S. § 50 20(c)(12) (2023). We disagree.

Under subsection 50-20(c), the court must consider the factors listed in equal

distribution including, "any other factor which the court finds to be just and proper." N.C.G.S. § 50-20(c)(12) (2023). However, "the trial court *may*, in its discretion, weigh the equities in a particular case and find that a credit or distributional factor would be appropriate under the circumstances," and "treat use as a distributional factor under N.C.G.S. § 50-20(c)(12)." *Walter v. Walter*, 149 N.C. App. 723, 732 (2002) (emphasis added). "[T]he use of [the word] 'may' generally connotes permissive or discretionary action and does not mandate or compel a particular act." *Brock & Scott Holdings, Inc. v. Stone*, 203 N.C. App. 135, 137 (2010) (citations omitted).

Our review is limited to whether there was a clear abuse of discretion. *White*, 312 N.C. at 777. Therefore, defendant's argument is without merit because the trial court did not abuse its discretion where it was permitted to choose whether to treat use as a distributional factor under subsection 50-20(c)(12). It is not for this Court to "weigh the equities" in this case, nor "find that a credit or distributional factor would be appropriate under the circumstances" where the trial court has exercised its discretion not to do so. *Walter*, 149 N.C. App. at 732. Likewise, the trial court's refusal to award defendant a credit for post-separation use of the martial home was not so "arbitrary that it could not have been the result of a reasoned decision," *Biggs*, 136 N.C. App. at 296–97, where plaintiff was in exclusive possession of the marital home because she had obtained a domestic violence protective order against defendant. Therefore, the trial court did not abuse its discretion by refusing to consider the parties' post-separation use of the martial home.

### 5. *Distributive Award*

Finally, defendant challenges the portion of conclusion of law 20 italicized below:

> That given the Defendant's animus towards the Plaintiff and his poor record of voluntary child support payments in the past, *it is equitable, just, and right and consistent with the child support guidelines to deduct retroactive child support arrearage that the Defendant owes the Plaintiff from the sale of Granite, if the Defendant be entitled to any of the same.*

Under subsection 50-20(f), "[t]he court shall provide for an equitable distribution without regard for alimony for either party or support of the children of both parties." N.C.G.S. § 50-20(f) (2023). Therefore, "[a]s a matter of sound public policy, child support obligations may not be offset by other obligations owed by one spouse to the other spouse," *Brinkley v. Brinkley*, 135 N.C. App. 608, 612 (1999), and "direct contravention of N.C.G.S. § 50-20(f) . . . constitutes an abuse of discretion," *Ward v. Ward*, No. COA01-892, 2002 WL 2004655, at *2 (N.C. Ct. App. Sept. 3, 2002); *see also Wiencek-Adams v. Adams*, 331 N.C. 688, 691 (1992).

Here, the trial court directly contradicted the explicit language of subsection 50-20(f) by providing an equitable distribution *with* regard for the support of the children. This kind of distribution is in direct conflict with both subsection 50-20(f) and the underlying policy this Court describes in *Brinkley*. Therefore, the trial court abused its discretion when it ordered a deduction to the "retroactive child support arrearage that the Defendant owes the Plaintiff from the sale of Granite, if the

Defendant be entitled to any of the same." Accordingly, we vacate and remand the equitable distribution order to comply with subsection 50-20(f).

## V.    Conclusion

The trial court did not err in ordering defendant to pay retroactive child support as authorized by subsection 50-13.4(c). However, we vacate and remand that portion of the trial court's order for recalculation of the children's specific portion of health insurance premium costs.

Those portions of the trial court's child support order supported by competent evidence—defendant's gross monthly income and plaintiff's past income—are affirmed. Similarly, we affirm the trial court's decision not to award defendant credit for his other biological child.

However, the trial court erred in utilizing Worksheet A when it did not make the appropriate factual findings as to the number of nights spent with each parent between 2018 and 2021, and we therefore vacate and remand that portion of the order for the trial court to make additional factual findings.

Those portions of the trial court's equitable distribution order supported by competent evidence—the classification of $8,996.00 and the valuation of the rings— are affirmed. We also affirm the trial court's decision not to award defendant credit for post-separation use.

However, the trial court erred in concluding the agreement should be set aside for duress or undue influence and we vacate and reverse that portion of the order.

Further, the trial court erred in ordering defendant's distributive award to offset his child support obligations in direct contradiction of N.C.G.S. § 50-20(f)(2023). Therefore, we vacate and remand the equitable distribution order for compliance with subsection 50-20(f).

AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.

Judges TYSON and CARPENTER concur.